UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/7/2020

DELIA M. FARQUHARSON,

                         Plaintiff,

    -against-

REGINALD A. LAFAYETTE, DOUGLAS A. COLETY,
JEANINE L. PALAZOLA, DOROTHY L. DIPALO, and
WESTCHESTER COUNTY BOARD OF ELECTION,

                     Defendants.

No. 19-cv-3446 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Plaintiff Delia M. Farquharson ("Plaintiff") brings this action, pursuant to 42 U.S.C. § 1983 ("Section 1983") against Defendants Reginald A. Lafayette ("Lafayette"), Douglas A. Colety, Jeannie L. Palazola, s/h/a Jeanine L. Palazola, Dorothy L. DiPalo (together, the "Individual Defendants"), and Westchester County Board of Elections ("BOE") (collectively, "Defendants"). (Compl., ECF No. 1.) Plaintiff alleges that Defendants denied her an opportunity to run for Mayor of Mount Vernon, New York, in deprivation of her First, Fourth, Fifth and Fourteenth Amendment rights. (*Id.*) Plaintiff also asserts several state-law claims. (*Id.*)

Presently before the Court is Defendants' motion to dismiss. (ECF No. 32.) For the following reasons, Defendants' motion is GRANTED with leave to amend.

## BACKGROUND

The following facts are taken from Plaintiffs' complaint and accompanying exhibits and are accepted as true for purposes of this motion.

### A. Lafayette's Alleged History of Targeting Plaintiff

The allegations underlying Plaintiff's complaint primarily center around a long running and contentious relationship between Plaintiff and Lafayette. To this end, Plaintiff is a City Councilor in

Mount Vernon and of Jamaican descent, while Lafayette is the Chairman and Commissioner of the BOE and the Chairman of the Mount Vernon Democratic Committee ("MVDC"). (Compl. ¶ 4.)

According to Plaintiff, Lafayette wields tremendous power as Commissioner of MVDC. For example, Plaintiff avers that, on July 27, 2015, Maria Caraballo, a two-time City Council candidate in Mount Vernon, stated in "Black Westchester Magazine" that Lafayette "[c]ontrols Mt. Vernon Politics." (*Id.* ¶ 11 (internal quotations omitted).) Caraballo explained that "if you are not liked by Reggie Lafayette, you are not going to be elected. There will never be an election in Mt. Vernon[] that will not be fixed as long as Reggie Lafayette is in office." (*Id.* (internal quotations omitted).) According to Plaintiff, during his time as commissioner, Lafayette has made disparaging remarks regarding individuals of West Indian descent (particularly Jamaicans) during public meetings. (*Id.* ¶¶ 5, 11[1].)

Plaintiff contends that Lafayette also routinely targeted Plaintiff during political events and nomination processes. (*Id.* ¶ 12.) For example, during the 2017 MVDC nomination process, Lafayette succeeded in installing Marcus Griffith in Plaintiff's place, even though Plaintiff had already been voted to be a nominee. (*Id.* ¶ 13.) The next year, in 2018, Lafayette delivered a message about "people wanting to be elected but not understanding how things work" in response to Plaintiff's expressing an intention to assume the role of City Council President. (*Id.* ¶ 14.)

Plaintiff and Lafayette's contentious history persisted into 2019. Specifically, on January 2, 2019, at a City Council committee meeting attended by Plaintiff and Lafayette (who is not a City Council member), Lafayette "looked directly at Plaintiff" as she entered the meeting and asked, "[A]re we going to have a smooth night[?]" (*Id.* ¶ 15.) This question was purportedly in reference to Plaintiff's plan to speak about the political properness of some of the City Council nominations.

---

[1]     The complaint contains two paragraphs numbered 11. This is a reference to the second paragraph 11.

(*Id.*) When asked for clarification, Lafayette responded, "[A]m I going to have to respond to anything as commissioner." (*Id.*) Then, during the meeting, Lafayette "placed himself in the direct vicinity of Plaintiff," thereby making her feel uncomfortable both in her official and personal capacity. (*Id.*)

**B. Plaintiff Files Untimely Petitions and Defendants Refuse to Return Them**

On or around February 7, 2019, Plaintiff completed all filing requirements to run for Mayor of Mount Vernon. (*Id.* ¶ 16.) Thereafter, in conjunction with at least six team members, Plaintiff collected 985 signatures from members of the Mount Vernon community (the "Petitions"). (*Id.* ¶ 17.)

On March 19, 2019 Plaintiff went to BOE with her Petitions. (*Id.* ¶ 18.) When she arrived, the clerk informed Plaintiff that the filing period in New York was from April 1, to April 4, 2019. (*Id.*) In response, Plaintiff asked the clerk if BOE would accept Plaintiff's Petitions for review, notwithstanding the deadline. (*Id.*) The clerk called Lafayette, who was in a back office of BOE, and informed him that Plaintiff was "here to submit petitions." (*Id.*) The clerk took the Petitions and went to the back office to meet with Lafayette. (*Id.*) At some point, either during the call or meeting, Lafayette decided, or authorized the clerk to decide, to take Plaintiff's Petitions. (*Id.* ¶ 19.) The clerk stamped the Petitions and made copies to distribute to Plaintiff. (*Id.*)

Shortly after, Plaintiff heard from community members that BOE planned to invalidate the Petitions. (*Id.* ¶ 20.) She further learned that BOE was planning to invalidate any signatures on the Petitions. (*Id.* ¶ 27.) As a result, on March 25, 2019, Plaintiff returned to BOE to obtain her Petitions.[2] (*Id.* ¶ 21.) Then, on March 27, 2019, Plaintiff received a call from Taijan Nelson, which informed Plaintiff that BOE had sent a letter, dated March 25, 2019, to Plaintiff. (*Id.* ¶ 22.)

---

[2]     The Complaint does not specify whether Plaintiff was able to re-obtain her Petitions. However, in her letter to BOE, dated March 27, 2019, Plaintiff notes BOE's "failure to return" her Petitions "for possible amendment." (Compl. Ex. II.)

In that letter, BOE informed Plaintiff that "[a]fter a prima facie examination of [the Petitions] purporting to nominate [Plaintiff] as a candidate for Mayor in the City of Mount Vernon, it was determined that the Petition . . . was not timely filed." (*Id.* Ex. A; *see also id.* ¶ 23.) BOE cited Section 6-158(1) of the New York State Election Law ("N.Y.E.L."), which established April 1, 2019 as the earliest date to file designating petitions. (*Id.* Ex. I.) BOE then noted that failure to file a petition within this timeframe "[was] a fatal defect." (*Id.*) BOE thus determined that Plaintiff's Petitions were "invalid" and informed her that her name would not appear on the Democratic Party ballot for Mayor of Mount Vernon primary election. (*Id.*) Plaintiff contends that, notwithstanding the letter's conclusion, BOE was not aware of what Plaintiff was going to do with her Petitions on or before April 1, 2019. (*Id.* ¶ 25.)

Plaintiff responded to BOE's letter on March 27, 2019. (*Id.* ¶ 26.) Plaintiff, through her counsel, informed BOE that the letter had "legal issues" and, in turn, urged for the BOE to reconsider its decision or provide Plaintiff with a hearing. (*Id.*) In the letter, Plaintiff acknowledged that Plaintiff's "Petitions were filed early" but argued that she nevertheless had a "timely claim to cure the violation[] and [was] entitled to attempt to do so."[3] (*Id.* Ex. II.)

The next day, on March 28, 2019, Plaintiff, her team members, and her attorney went to BOE in person. (*Id.* ¶ 28.) During the meeting, Lafayette laid out his concern with accepting Plaintiff's untimely Petition, explaining that "a major problem, [which] nobody can get a handle on, is a lot of people backdate signatures." (*Id.* ¶ 29.) Plaintiff then asked Lafayette why BOE accepted her Petitions if it knew it would later invalidate them. (*Id.* ¶ 30.) Lafayette explained that the Petitions were "already turned in by the time [the clerk] went to the back to speak with [him]." (*Id.*) Plaintiff,

---

[3]     BOE's counsel responded on April 1, 2019. (Compl. Ex. IV.) The letter reiterated the statutorily prescribed time period for submitting designating petitions for the 2019 primary election and noted that Plaintiff had submitted her Petitions outside of that period. (*Id.*) BOE further informed Plaintiff that she could not cure her Petitions' defects because the cure period would still conclude prior to the commencement of the statutorily mandated designating petition filing period. (*Id.*)

however, corrected him, noting that the Petitions were "unstamped" at that moment.  (*Id.*)  Although Plaintiff does not provide further details, she notes that "[n]o BOE hearing was ever scheduled by the BOE" regarding the Petitions.  (*Id.* ¶ 31.)

### C.  Plaintiff Files an Amended Cover Sheet but Remains Off the Primary Ballot

Notwithstanding her untimely March filing, Plaintiff timely filed an amended cover sheet for her Petitions on April 1, 2019.  (*Id.* ¶ 32.)  Upon this now-timely filing, Specific Objections ("Specs") to Plaintiff's petitions were lodged, some allegedly after the filing deadline was complete.  (*Id.* ¶ 33.) Plaintiff maintains that these Specs came from individuals "affiliated with Lafayette."  (*Id.*)

Plaintiff and her attorney eventually confronted Lafayette and told him that they believed BOE was engaged in illegal activity.  (*Id.*)  Plaintiff then asked Lafayette what dates he was using to determine whether the Specs were timely filed.  (*Id.*)  In that conversation, Plaintiff and Lafayette disputed whether one Spec at issue was filed on the fourth or eighth of April.  (*Id.*)  As it relates to this Spec, Lafayette explained that, although there was a Spec dated April 4th, a new Spec was timely filed on April 8th after Plaintiff again amended her Petition cover sheet.  (*Id.*)  Lafayette insisted that this was proper because "[o]nce [Plaintiff] amend[e]d [her Petition], [the time to file Specs] starts all over again."  (*Id.*)  At some point during this conversation, Lafayette then noted that Plaintiff had "time to even correct [her] mistakes" but the filing had to be kept by BOE.  (*Id.*)

Plaintiff argues that Lafayette admitted that "Plaintiff's process of amending the cover sheet for [her] Petitions was proper, and that the process that the BOE engaged in prior to April 1, 2019 regarding the attempt to rule the Petitions out of the elections before giving an opportunity to amend the cover letter or cure the petitions was per se illegal."  (*Id.* ¶ 34.)  Plaintiff further avers that Lafayette "understood more than any other person" how a candidate could modify petitions until the filing deadline concluded but nevertheless "blocked" Plaintiff from running for office. (*Id.* ¶ 35.)  BOE, according to Plaintiff, was "complicit" by failing to stop Lafayette's activity.  (*Id.*)

# LEGAL STANDARDS

## I. 12(b)(1)

When a court lacks the statutory or constitutional power to adjudicate a case, it should dismiss the case for lack of subject matter jurisdiction under Rule 12(b)(1). *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). In assessing whether there is subject matter jurisdiction, the Court must accept as true all material facts alleged in the complaint, *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009), but "the court may resolve [any] disputed jurisdictional fact issue by referring to evidence outside of the pleadings." *Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000).

One example of when a court lacks subject matter jurisdiction is when the case becomes moot. *See Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78, 81 (2d Cir. 2013). Similarly, lack of standing may be grounds for dismissal under Rule 12(b)(1). *Buonasera v. Honest Co.*, 208 F. Supp. 3d 555, 560 (S.D.N.Y. 2016).

## II. 12(b)(6)

The relevant inquiry under Rule 12(b)(6) is whether a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. To this end, to survive a motion to dismiss, a complaint must supply "factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). The Court must take all material factual allegations as true and draw reasonable inferences in the non-moving

party's favor, but the Court is "'not bound to accept as true a legal conclusion couched as a factual allegation,'" or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555. A district court must consider the context and "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Ultimately, the allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

## III.    Section 1983

Under Section 1983, "[e]very person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself the source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). To state a claim under Section 1983, a plaintiff must allege (1) the challenged conduct was attributable to a person who was acting under color of state law and (2) "the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution." *Castilla v. City of New York*, No. 09 Civ. 5446(SHS), 2013 WL 1803896, at *2 (S.D.N.Y. Apr. 25, 2013); *see also Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010).

## DISCUSSION

### I.    Defendants' Mootness and Standing Challenges

Defendants proffer two challenges to this Court's jurisdiction to hear Plaintiff's claims. *First*, Defendants argue that, because the primary election has already taken place, Plaintiff's claims related

to the validity of the March Designating Petition are moot. (Defs. Mem. of Law in Supp. of Mot. to Dismiss ("Defs. Mot."), ECF No. 32, at 3.) *Second*, Defendants contend that Plaintiff lacks standing to assert her claims because she has failed to establish that she suffered an injury in fact, that her alleged harm is fairly traceable to Defendants' conduct, or that a favorable decision can redress her purported harm. (*Id.* at 5-7.) In response, Plaintiff argues that her claims are not moot because, even though the election has passed, the Court can still award, *inter alia*, damages related to her claims. (Pl. Opp. to Defs. Mot. (Pl. Opp.), ECF No. 37, at 4.) She further argues that she has standing to maintain her claims. (*Id.* at 6.)

As this Court must determine whether it has subject matter jurisdiction before it can rule on the merits of any claim, the Court assesses Defendants' challenges below. As will be explained, the Court concludes that, although Plaintiff's claims for injunctive and declaratory relief have been mooted by the passage of the primary election, her claims are not moot to the extent she seeks damages for Defendants' alleged constitutional violations. The Court further concludes that Plaintiff has easily established standing to pursue her claims, regardless of their ultimate merits.

### A. Mootness

"The mootness doctrine, which is mandated by the 'case or controversy' requirement of Article III of the United States Constitution, requires that federal courts may not adjudicate matters that no longer present an actual dispute between parties." *Catanzano v. Wing*, 277 F.3d 99, 107 (2d Cir. 2001) (citing *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477-78 (1990)). "A case is moot 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome,'" such that a court cannot provide any relief to redress a plaintiff's claimed injuries. *Piccolo v. N.Y.C. Campaign Fin. Bd.*, No. 05 CV 7040(GBD)(MHD), 2007 WL 2844939, at *7 (S.D.N.Y. Sept. 28, 2007) (internal quotations and citations omitted).

As is relevant here, the "passage of an election does not necessarily render an election-related case moot." *Freedom Party of N.Y. v. N.Y.S. Bd. of Elections*, 77 F.3d 660, 662 (2d Cir. 1996) (citing *Storer v. Brown*, 415 U.S. 724 (1974)). The question courts must address in an election-related context is whether the issues alleged are "capable of repetition, yet evading review." *See Lerman v. Bd. of Elections in City of N.Y.*, 232 F.3d 135, 142 (2d Cir. 2000). "[A] controversy is capable of repetition, yet evading review where both of the following two requirements are met: '(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again.'" *Van Wie v. Pataki*, 267 F.3d 109, 113-14 (2d Cir. 2001) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)). Regardless of this inquiry, if a plaintiff seeks money damages, that claim will not be deemed moot. *See id.* at 115 n.4 ("We note that had the plaintiffs sought money damages in addition to their request for injunctive relief, this controversy would not be moot. Indeed, for suits alleging constitutional violations under 42 U.S.C. § 1983, it is enough that the parties merely request nominal damages.").

Here, Plaintiff seeks injunctive and declaratory relief that would declare Plaintiff's filing timely and deem the "amended petition date [as] determinative for filing." (Compl. ⁋ 78.) However, the mayoral primary was held on June 25, 2019. (Defs. Mot. 3.) Accordingly, as Plaintiff can no longer run for mayor in this election cycle, the passage of the primary has "eradicated the effects of the defendant's act or omission" regarding the validity of the Petitions. *See Van Wie*, 267 F.3d at 113 ("We conclude that this appeal is moot because the March 2000 primary election, in which the appellants sought to participate, has passed."). And, although a moot case may still be justiciable if the dispute is capable of repetition, yet evading review, Plaintiff here has failed to make any showing that there is a reasonable expectation that she would be subjected to the same action again by

Defendants in future elections. The Court hence has no basis to conclude that Plaintiff's claims for injunctive and declaratory relief remains justiciable.

To avoid this outcome, Plaintiff relies on *Arbor Hill Concerned Citizens v. Cty. of Albany*, 357 F.3d 260 (2d Cir. 2004) to contend that the Court could "call for a special election." (Pl. Opp. 4.) In citing *Arbor Hill*, Plaintiff quotes the Second Circuit's holding as follows: "it is within the scope of [the court's] equity powers to order a governmental body to hold special elections." (*Id.* (quoting *Arbor Hill*, 357 F.3d at 262.) Plaintiff's reliance on *Arbor Hill*, however, is misplaced. The Second Circuit made it clear that this equity power relates to violations of the Voting Rights Act (a portion of the *Arbor Hill* quotation that Plaintiff noticeably omits). Plaintiff points to no other authority that establishes that the Court could order a special election as a remedy for a Section 1983 constitutional violation. The Court GRANTS Defendants' motion to dismiss Plaintiff's claims for injunctive and declaratory relief as moot, without prejudice.

Plaintiff, however, has also sought damages as part of her requested relief for her various constitutional and state claims. (Compl. ¶ 78.) As a result, Plaintiff continues to maintain a legally cognizable interest in the outcome of this case, notwithstanding the passing of the mayoral primary election. *See, e.g.*, *Marin v. Town of Southeast*, 136 F. Supp. 3d 548 (S.D.N.Y. 2015) ("[I]n general 'so long as the plaintiff has a cause of action for damages, a defendant's change in conduct will not moot the case.'"); *Sugarman v. Vill. of Chester*, 192 F. Supp. 2d 282, 290 (S.D.N.Y. 2002) ("Plaintiff has asserted a proper claim for nominal damages under § 1983 for the alleged constitutional violation. It therefore follows that plaintiff has a legally cognizable interest in the outcome of the dispute, and that her claims are not moot."). Thus, the Court concludes that Plaintiff's claims are not mooted to the extent that she seeks damages related to Defendants' purported constitutional violations.

The Court next turns to whether Plaintiff has standing to bring her claims.

## B. Standing

To ensure that there is a case or controversy, the Supreme Court has held that parties before federal courts must have standing to bring their claims. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff has standing if he or she has suffered "(1) an injury that is (2) 'fairly traceable to a defendant's allegedly unlawful conduct' and that is (3) 'likely to be redressed by the requested relief.'" *Id.* 560-61 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). For purposes of standing, an injury must be an injury in fact, meaning "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 560 (internal citations and quotations omitted). On a motion to dismiss, "the plaintiff has no evidentiary burden" and the "task of the district court is to determine whether the [p]leading 'allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue.'" *Am. Bird Conservancy v. Harvey*, 232 F. Supp. 3d 292, 301 (E.D.N.Y. 2017) (quoting *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016)).

Here, regardless of the ultimate merits of her claims, Plaintiff has established her standing to sue. *First*, Plaintiff has alleged an injury-in-fact that is concrete and particularized and actual, not conjectural. Specifically, Plaintiff has alleged that she was deprived of an opportunity to run for mayor because of purported impropriety related to the handling of her Petitions. *Second*, Plaintiff's harms, as alleged, were "fairly traceable" to Defendants' conduct, regardless of whether her claims are legally viable on the merits. As Plaintiff's pleadings aver, Defendants' decision making regarding Plaintiff's Petitions—whether or not unlawful or even the proximate cause of her harm—fall within the chain of causation leading to Plaintiff's absence from the mayoral primary ballot.[4] *See Fulani v.*

---

[4]    Defendants fiercely dispute causation, contending that it was the combination of Plaintiff's failure to timely file her Petition under N.Y.E.L., as well as the objections invalidating the signatures in the Petitions after she filed an amended cover sheet, that caused Plaintiff's alleged injuries. (Defs. Mot. 5-6; Defs. Reply in Supp. of Defs. Mot. ("Defs. Reply"), ECF No. 35, at 4-5.) Defendants' argument, however, ultimately goes to the merits and plausibility of Plaintiff's claims, rather than her standing to bring them. On this point, the Court emphasizes that

*League of Women Voters Educ. Fund*, 882 F.2d 621, 627-28 (2d Cir. 1989) (explaining that plaintiff's injury did not "derive solely from the fact that she ultimately failed to win the presidency" but rather "the asserted harm also flow[ed] from [non-federal defendant's] allegedly partisan restriction of her opportunities to communicate her political ideas to the voting public at large" as well as the "federal defendants' tax treatment of the [non-federal defendant]"); *Harvey*, 232 F. Supp. 3d at 305 (explaining that, although there were several links in the causation chain, defendant's causal connection to Plaintiffs' claims were "neither hypothetical nor tenuous"). *Finally*, as to redressability, the Court again notes that Plaintiff seeks damages. As such, even without the injunctive and declaratory component of her requested relief, Plaintiff, if meritorious, could be redressed by a favorable ruling. Defendants' challenge to Plaintiff's standing fails.

The Court now turns to the merits of Plaintiff's Section 1983 claims.

## II. Plaintiff's Section 1983 Claims

Plaintiff has brought four separate causes of action under Section 1983. *First*, Plaintiff asserts a violation of her right to due process under the Fifth and Fourteenth Amendment. (Compl. ¶¶ 51-56.) *Second*, Plaintiff alleges "discrimination" under the First and Fourteenth Amendment. (*Id.* ¶¶ 61-64.) *Third*, Plaintiff asserts a claim for "disparate impact" under the First and Fourteenth Amendment. (*Id.* ¶¶ 65-68.) *Finally*, Plaintiff avers that Defendants' violated her "right to be secure from unreasonable seizures" under the Fourth Amendment. (*Id.* ¶¶ 42-51.) The Court considers each of these four causes of action below.

---

"just because Plaintiff[] here ha[s] alleged an injury-in-fact that is 'fairly traceable to the challenged conduct and redressable by a favorable judicial decision[]' [] does not mean that Plaintiff[] ha[s] a valid claim on the merits." *Maslow v. Bd of Elections in City of N.Y.*, No. 06-CV-3683 (NGG)(SMG), 2018 WL 2185370, at *4 (E.D.N.Y. May 23, 2008), *aff'd*, 658 F.3d 291 (2d Cir. 2011).

**A. Due Process Claim**

Plaintiff maintains that Defendants violated her due process rights by failing to schedule a hearing related to the retention and propriety of Plaintiff's Petitions. (Pl. Opp. 11; Compl. ¶¶ 52-55.) Defendants counter that Plaintiff has failed to establish a due process violation, in part because she failed to avail herself to New York's state court review process under the N.Y.E.L. (Defs. Mot. 12-13.) The Court agrees.

The Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "The Due Process Clause does not protect against all deprivations of constitutionally protected interests in life, liberty, or property, only against deprivations without due process of law." To maintain a due process claim, a plaintiff must first establish that he or she had a protected property or liberty interest. *White Plains Towing Corp. v Patterson*, 991 F.2d 1049, 1061-62 (2d Cir. 1976). Thereafter, to assess whether a due process violation occurred, courts must "ask what process the State provided[] and whether it was constitutionally adequate." *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) (quoting *Zinermon v. Burch*, 494 U.S. 113, 126 (1990)).

To determine whether a state or local government has complied with procedural due process, courts "distinguish between (1) claims based on established governmental procedures, and (2) claims based on random or unauthorized acts by public employees." *Vaher v. Town of Orangetown, N.Y.*, 133 F. Supp. 3d 574, 604 (S.D.N.Y. 2015) (quoting *G.I. Home Developing Corp. v. Weis*, 499 F. App'x 87, 88 (2d Cir. 2012)). "When the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides meaningful post-deprivation remedy." *Rivera-Powell*, 470 F.3d at 465. Conversely, when the deprivation is pursuant to an established state procedure, "the availability of post-deprivation procedures will not, *ipso facto*, satisfy due process." *Id.* (quoting *Hellenic Am. Neighborhood Action Comm. v. City of New York*,

101 F.3d 877, 880 (2d Cir. 1996)).  Rather, in such cases, courts must evaluate the adequacy of the post-deprivation remedy by considering the following factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Murawski v. Pataki*, 514 F. Supp. 2d 577, 585 (S.D.N.Y. 2007) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Here, the Court need not assess whether Defendants' conduct was characterized as random and unauthorized or the product of an established state procedure.  As an initial matter (and although not addressed by either party), it is unclear that Plaintiff even has a property or liberty interest in her mayoral candidacy.  Courts have routinely concluded that "a candidate for political office holds no property or liberty interest in an elected position." *Leroy v. N.Y.C. Bd. of Elections*, 793 F. Supp. 2d 533, 537 (E.D.N.Y. 2011) (candidate's due process claim, alleging that the board of elections violated her due process rights when they failed to certify her name for the ballot, failed because she had no property interest in her candidacy); *Douglas v. Niagara Cty. Bd. of Elections*, No. 07-CV-609A, 2007 WL 3036809, at *4 (W.D.N.Y. Oct. 16, 2007) (no property interest where board of elections invalidated petition upon a finding of insufficient number of valid signatures); *Cornett v. Sheldon*, 894 F. Supp. 715, 725-26 (S.D.N.Y. 1995) (no property interest, and therefore no due process violation, where plaintiff had alleged that defendants failed to give him notice of the specifications to objections to his petition prior to a board of elections hearing).  In the absence of a protected property or liberty interest, there is no due process violation.

In any event, the process accorded to Plaintiff easily passes Constitutional muster regardless of whether the conduct issue was random or pursuant to established state procedure.[5] As Defendants note, N.Y.E.L. § 16-102 ("Article 16") provides for expedited state-court proceedings to review the validity of petition designations. (Defs Mot. 12-13.) Courts in this circuit, in turn, have repeatedly concluded that Article 16 "satisfies due process requirements," "[e]ven in the absence of an opportunity to be heard prior to a [board of election's] decision."[6] *Murawski*, 514 F. Supp. 2d at 586 n.5; *see also EH Fusion Party*, 401 F. Supp. 3d at 38 ("'[A]fter the Board's action, [there is] the opportunity to obtain full judicial review under New York Election Law section 16-102, which provides for expedited proceedings as to designations.' This is an adequate post-deprivation remedy that 'satisfies due process.'" (internal quotation omitted)); *Bal*, 2018 WL 6528766 at *8 ("Courts following *Rivera-Powell* have categorized the expedited review provided by N.Y. Election Law § 16-102 as both pre- and post-deprivation review adequate to satisfy due process concerns."); *Leroy*, 793 F. Supp. 2d at 540-41 ("In any case, New York Election Law § 16–102, if not a 'pre-deprivation' remedy, provided Leroy, as in *Rivera–Powell*, with the opportunity to obtain full 'post-deprivation' judicial review."); *Douglas*, 2007 WL 3036809 at *5 ("[E]ven if the Court were to hold that the plaintiff had a property interest in his candidacy, the availability of an expedited special proceeding

---

[5] This is true whether the property/liberty interest is characterized as Plaintiff's interest in being a primary candidate or if Plaintiff is attempting to maintain that the protected interest is in her Petitions.

[6] Although both parties focused on Plaintiff's post-deprivation remedies, several courts that have considered the issue have concluded that Article 16 is more akin to a pre-deprivation remedy. *See, e.g., Dekom v. Nassau Cty.*, No. 12-CV-3473 (JS)(ARL), 2013 WL 5278019, at *7 (E.D.N.Y. Sept. 18, 2013) ("courts have addressed this very issue, finding that Section 16-102 provides a pre-deprivation remedy and thus denying due process claims strikingly similar to those Plaintiffs now raise."); *Leroy*, 793 F. Supp. 2d at 539-40 (noting that "if the denial of ballot access is a deprivation within the ambit of due process, deprivation occurs at the first moment a voter can cast a ballot in the subject election contest, if the candidate has not yet been reinstated to the ballot); *Murawski*, 514 F. Supp. 2d at 586 n.5 (describing Article 16 as a pre-deprivation remedy); *Douglas*, 2007 WL 3036809 at *5 ("In the Court's view, the special proceeding [under Article 16] constitutes an adequate 'pre-deprivation' procedure."). Other courts, however, have classified Article 16 as a post-deprivation remedy. *See, e.g. EH Fusion Party v. Suffolk Cty. Bd. of Elections*, 401 F. Supp. 3d 376, 389 (E.D.N.Y. 2019) (describing Article 16 as a "post-deprivation remedy"). The distinction ultimately does not impact the due process considerations outlined above. *See Bal v. Manhattan Democratic Party*, No. 16-cv-2416 (PKC), 2018 WL 6528766, at *8 (S.D.N.Y. Dec. 12, 2018)

under NYS Elec. Law § 16-102 to address the merits of his petition satisfies the requirements of procedural due process."); *Cornett*, 894 F. Supp. at 727 (describing Article 16 as a "comprehensive and expeditious state court process which attempts to adjudicate election law disputes promptly" and finding no due process violation where plaintiff failed to take advantage of it).

As Plaintiff alleges here, she filed her Petitions on March 19, 2019, well before the April 1 to April 4, 2019 timeframe for filing petitions. (AC ₱ 18.) BOE then notified Plaintiff that her Petitions were not timely filed and that she would not appear on the ballot for this reason. (*Id.* ₱₱ 21-23; *see also id.* Ex. I.) Plaintiff wrote to BOE, demanding a hearing, but did not receive one at any point. (*Id.* ₱₱ 26, 31.) Although BOE never scheduled a hearing, Plaintiff had a comprehensive judicial mechanism, established by state law, at her disposal. That mechanism would have allowed her to challenge the BOE's determination, regardless of whether BOE provided her with the requested hearing. Plaintiff chose not to avail herself to the Article 16's procedure, but her decision has no impact on the adequacy of her due process rights in this case (to the extent they exist).[7] *See Bal*, 2018 WL 6528766 at *9 ("Although he did not avail himself of either opportunity, that is of no moment in evaluating whether he was afforded due process of law."). The Court GRANTS Defendants' motion to dismiss Plaintiff's due process claim, with prejudice.

**B. Equal Protection Claims/First Amendment Claims**

1. *Discrimination*

Plaintiff has brought a claim related to discrimination under the First and Fourteenth Amendment. (Compl. ₱₱ 61-64.) To this end, Plaintiff contends Defendants applied "policies that [were] neutral on their face" in a discriminatory manner. (*Id.* ₱ 62.) Defendants challenge these

---

[7]     Plaintiff does not contend that she lacked awareness of Article 16. Nor could she. As Plaintiff concedes, she availed herself to this judicial review when BOE's determination of viability of her amended Petitions. (Pl. Opp. 7.) Plaintiff cannot now be heard to argue that an "established state procedure" by Defendants destroyed her entitlement to being on the ballot for the June 2019 mayoral primary. (*See id.* 11.)

claims, contending that Plaintiff has failed to identify "the manner, type, or kind of alleged discrimination in processing her March Designating Petition." (Defs. Mot. 13.)

The Court initially notes that, although she frames her claims as sounding under both the First Amendment and Fourteenth Amendment, it does not appear as if Plaintiff is, in fact, pleading a First Amendment claim. It is true that "[c]ourts in this district have recognized that denial of ballot access can effect a deprivation of the First Amendment right to free association." *Marchant v. N.Y.C. Bd. of Elections*, 13 Civ. 5493(KPF), 2013 WL 4407098, at \*4 (S.D.N.Y. Aug. 16, 2013). But Plaintiff's complaint is devoid of allegations that Defendants' decisions regarding her Petitions were premised on Plaintiff's political affiliation, associational conduct, or even her speech.[8] Instead, the gravamen of Plaintiff's discrimination claim focuses on how Defendants purportedly treated Plaintiff differently than other primary candidates in its application of New York's election laws. (Pl. Opp. 9-10.) Plaintiff further avers that one potential basis for discrimination was Plaintiff's West Indian heritage." (*Id.* at 10.) Under this framing, the Court concludes that Plaintiff's discrimination claim sounds solely under the Equal Protection clause. To this end, the Court discerns two Equal Protection challenges: selective enforcement and intentional discrimination. The Court considers each below.

"The Equal Protection Clause of the Fourteenth Amendment directs that similarly situated individuals be treated alike." *Bal*, 2018 WL 6528766 at \*10 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). To establish an equal protection violation, a plaintiff must prove (1) "purposeful discrimination directed at an identifiable or suspect class," and (2) "that

---

[8]     To the extent Plaintiff premises her First Amendment claims on Defendants' purported failure to provide her with a hearing regarding her challenge to their March 25, 2019 decision, her claim fails for the same reasons her due process challenge failed. It is well settled that, where a plaintiff's "First Amendment claims are 'virtually indistinguishable' from" his or her due process claims," a failure to state a due process claim "necessarily" means that plaintiff has failed to state a First Amendment claim. *See Dekom*, 2013 WL 5278019 at \*8 (citing *Rivera-Powell*, 470 F.3d at 468-69); *Marchant*, 2013 WL 4407098 at \*4 ("Plaintiffs' First Amendment claims are 'virtually indistinguishable' from their due process claims (and fail for the same reason), because they arise from the same alleged violation, namely, Plaintiff Lee's exclusion from the primary ballot due to errors in two cover sheets.").

similarly situated people were treated differently." *Leroy*, 793 F. Supp. 2d at 542 (citing *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995)); *Powell v. Powell*, 436 F.2d 84, 88 (2d Cir. 1970); *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 193 (2d Cir. 1994)). Critically, "a § 1983 action to remedy errors in the election process allegedly violating the equal protection clause does not exist unless the state action constituted 'intentional or purposeful discrimination.'" *Gold v. Feinberg*, 101 F.3d 796, 800 (2d Cir. 1996) (quoting *Powell*, 436 F.2d at 88 (internal quotations omitted)); *see also Gelb v. Bd. of Elections of City of N.Y.*, 224 F.3d 149, 154 (2d Cir. 2000) ("It is thirty-year-old doctrine in this Circuit that a § 1983 action invoking the Equal Protection Clause is not available to remedy election process errors in the absence of a showing of 'intentional or purposeful discrimination.'").

An Equal Protection claim can be "sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out." *Bal*, 2018 WL 6528766 at *11 (quoting *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 601 (2008)). Whether pursuing a "selective enforcement" or "class of one" theory, it is incumbent upon a plaintiff to sufficiently identify a similarly situated comparator and show that he or she was treated differently as compared to those others similarly situated. *Tower Props. LLC v. Vill. of Highland Falls*, No. 14 Civ. 4502 (NSR), 2017 WL 519267, at *4 (S.D.N.Y. Feb. 7, 2017).

Where discrimination is premised on a protected characteristic (such as race or national origin), a plaintiff must show that a defendant "intentionally discriminated against [him or her], either by adopting out of [] animus [to a protected characteristic] policies which are facially neutral but have a [] discriminatory effect, or by applying a facially neutral policy in a [] discriminatory manner." *Rivera-Powell*, 470 F.3d at 470 (citing *Hayden v. Cty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999)). "[C]onclusory allegation[s] of discrimination, [] 'without evidentiary support or allegations of particularized incidents, do[] not state a valid claim' and [] cannot withstand a motion to dismiss."

*Id.* at 470 (quoting *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (internal quotations omitted)).

Here, Plaintiff's discrimination claim fails for two separate reasons. To start, Plaintiff has not sufficiently pled a similarly situated comparator who was treated differently by Defendants. Rather, Plaintiff offers a single conclusory allegation that Defendants applied "policies that are neutral on their face" in a "discriminatory or punitive manner" and/or created policies to discriminate specifically against Plaintiff. (Compl. ¶ 62.) Such naked assertions plainly fail to sufficiently plead a discrimination claim. As a result, to seemingly cure this deficiency, Plaintiff substantially relies on state court's opinion in *Swiller v. Lecuona*, 56 Misc. 3d 1218(A) (N.Y. Sup. Ct. Westchester Cty. Aug. 16, 2017), to point to a "clear difference in how applicable time periods for filing Petitions were applied to candidates" other than Plaintiff. (Pl. Opp. 9.) The Court disagrees.

In *Swiller*, the respondents had filed a four-volume petition with cover sheets designating them as candidates in an upcoming Democratic Party primary election for the positions of Mayor and Common Council of the City of White Plains. 56 Misc. 3d 1218(A) at *1. Two days later, at the suggestion of a BOE member, the candidates re-filed the four petitions with amended cover sheets, this time providing (1) two volumes that listed all four candidates, (2) a volume listing only one candidate, and (3) volume listing the remaining three candidates. *Id.* at *1, *5. After BOE reviewed the designating petitions and accompanying objections, it concluded that the candidates had enough signatures to appear on the primary ballot. *Id.* at *1. The challenge to the amended cover sheets in *Swiller* related to whether the candidates could "unilaterally amend" them on the last day to file petitions after having filed the original cover sheets two days earlier. *Id.* at *5. Nothing in the *Swiller* opinion, however, suggests that the candidates filed their petitions *outside* of the statutorily prescribed timeframe detailed by N.Y.E.L. § 6-158 or that they were in anyway treated differently from Plaintiff

during BOE's petition review process.[9]  As such, the candidates in *Swiller* do not constitute similarly situated comparators for purposes of an Equal Protection violation.

Plaintiff's discrimination claim also fails more fundamentally because she has not pleaded Defendants' intentional discrimination in their application of New York's otherwise facially neutral election law.  Instead, Plaintiff merely contends, in conclusory fashion, that Lafayette "would not allow Plaintiff to exercise her constitutional and legal right to run for office free from discrimination." (Compl. ¶ 35.)  Although Plaintiff claims that she was treated differently because she is of "West Indian" descent (Pl. Opp. 10), the complaint contains no allegations that suggest that this was a factor in any of the Defendants' decisions.  Indeed, even factoring in Lafayette's historical disparagement of people of "West Indian" descent, the most charitable reading of Defendants complaint, as drafted, and its accompanying documents is that Defendants rejected Plaintiff's Petitions filed on March 19, 2019 because she failed to comply with N.Y.E.L. § 6-158—a "fatal defect" under the law—as opposed to some discriminatory purpose.[10]  As such, the Court GRANTS Defendants' motion to dismiss Plaintiff's discrimination claims, without prejudice.

### 2. *Disparate Impact*

In addition to her discrimination claim under the First and Fourteenth Amendment, Plaintiff also brings a "disparate impact" claim under those same two Amendments.  (Compl. ¶¶ 65-68.)  The Court first notes that "First Amendment law does not recognize disparate impact claims." *United*

---

[9]     If anything, the procedures reflected in *Swiller* appear consistent with what occurred in this case.  As the *Swiller* opinion explains, BOE reviewed the objections filed against the candidates' designating petitions and, in turn, disqualified signatures as invalid.  *Swiller*, 56 Misc. 3d 1218(A) at *1 ("Swiller and Walfish filed objections to the designating petitions with the Westchester County Board of Elections ("the Board").  The Board reviewed the objections and determined the Lecuona petitions contained 950 valid signatures, disqualifying 1,691 signatures as invalid.").  This appears to be the same process that transpired with Plaintiff's Petitions upon the filing of her amended cover sheet for the Petitions, notwithstanding Plaintiff's allegations of impropriety.  (*See* Compl. ¶ 33.)  The only difference is that, in *Swiller*, there were still enough valid signatures to allow the candidates to appear on the primary ballot. 56 Misc. 3d 1218(A) at *1.

[10]    *See* N.Y.E.L. § 1-106(2) ("The failure to file any petition or certificate relating to the designation or nomination of a candidate for party position or public office or to the acceptance or declination of such designation or nomination within the time prescribed by the provisions of this chapter shall be a fatal defect.").

*States v. Weslin*, 156 F.3d 292, 297 (2d Cir. 1998); *see also Incantalupo v. Lawrence Union Free Sch. Dist. No. 15*, 829 F. Supp. 2d 67, 74 (E.D.N.Y. 2010) ("[T]here is 'no disparate-impact theory in First Amendment law.'" (quoting *Terry v. Reno*, 101 F.3d 1412, 1419-20 (D.C. Cir. 1996); *United States v. Dinwiddie*, 76 F.3d 913, 923 (8th Cir. 1996))).  Consequently, like Plaintiff's discrimination claim, her disparate impact claim is properly analyzed solely under the Equal Protection clause.

Plaintiff's disparate impact claim, however, fails for the same reason as her discrimination claim: she has not established that Defendants' challenged conduct "was undertaken with discriminatory intent." *Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 338 (2d Cir. 2000) (citing *Washington v. Davis*, 426 U.S. 229, 239-41 (1976)).  "Although [d]isproportionate impact is not irrelevant, to violate the Fourteenth Amendment the disproportionate impact must be traced to a purpose to discriminate on the basis of a [protected characteristic]." *Hayden v. Paterson*, 594 F.3d 150, 162-63 (2d Cir. 2010).  As Plaintiff has not established a requisite discriminatory intent underlying any purported disparate impact, the Court GRANTS Defendants' motion to dismiss Plaintiff's disparate impact claim, without prejudice.

### C.  Fourth Amendment Claim

Plaintiff asserts that Defendants violated the Fourth Amendment by "confiscating and then attempting to constructively and/or effectively destroy Plaintiff's valid Petitions."  (Compl. ‖ 46.) Defendants retort that no Fourth Amendment seizure occurred, and that, in any event, retention of Plaintiff's Petitions that were filed in March was reasonable.  (Defs. Mot. 11-12.)  The Court agrees.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  "A 'seizure' of property . . . occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" *Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S 109, 113 (1984)).  A seizure can occur "even where privacy or

liberty is not implicated." *Ostensen v. Suffolk Cty.*, 378 F. Supp. 2d 140, 147 (E.D.N.Y. 2005).

Nevertheless, "'reasonableness is [] the ultimate standard' under the Fourth Amendment." *Soldal*, 506 U.S. at 71 (internal citation omitted). "Determining the reasonableness of a seizure requires balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Kiyak v. Town of Fairfield*, No. 3:17-cv-1426(AWT), 2019 WL 2895640, at *3 (D. Conn. Mar. 25, 2019) (quoting *Scott v. Harris*, 550 U.S. 372, 3838 (2007)). And "[w]here . . . an initial seizure of property was reasonable, defendants' failure to return [an] item[] does not, by itself, state a separate Fourth Amendment claim of unreasonable seizure." *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 187 (2d Cir. 2004).

Here, when she went to BOE on March 19, 2019, Plaintiff knowingly submitted her Petitions outside the statutorily prescribed timeframe of April 1 to April 4, 2019. (*See* Compl. ¶ 18; *id.* Ex. II ("It is clear from the information on the cover sheet that the Candidate's Petitions were filed early.").) In opposing Defendants' motion, Plaintiff does not dispute this. (*See* Pl. Opp. 7-8.) Instead, Plaintiff's conclusory position—raised for the first time in her opposition—is that she submitted the Petitions because she was misled into thinking that BOE would review them. (*Id.* at 8, 10.) Plaintiff's complaint, however, does not explicitly allege misleading conduct or give rise to that inference. Although Plaintiff later learned that BOE "was planning on invalidating every petition" submitted on March 19, the complaint does not indicate that Defendants engaged in any impropriety to convince Plaintiff to go to BOE and part ways with her Petitions prior to April 1, 2019.

Plaintiff's contention that Defendants failed to return her Petitions, thereby unreasonably seizing them, also fails under a Fourth Amendment analysis. As Defendants note, and Plaintiff does not dispute, N.Y.E.L. prevents the removal of petitions "from the office of the board of elections for copying or any other purpose while in the custody, or under the supervision of a member or employee

or employee of such board." *See* N.Y.E.L. § 3-220(6-a). Plaintiff cannot, therefore, credibly contend that Defendants' continued "seizure" of her Petitions was unreasonable. In fact, Defendants were seemingly acting consistent with New York law.

Finally, to the extent Plaintiff premises her Fourth Amendment seizure claim on purported "constructive[] and/or effective[]" destruction of Plaintiff's valid petitions," Plaintiff has represented that she was able to "timely file an amended cover sheet for the Petitions on April 1, 2019." (Compl. ⁋ 32). As she acknowledges in her opposition, at least implicitly, this timely filing "revive[d] her Designating Petition." (Pl. Opp. 6, 8.) Plainly, any purported "constructive destruction" is belied by Plaintiff's own factual representations.[11]

In conclusion, even accepting all facts as true, the Court cannot conclude that Plaintiff has pled a Fourth Amendment claim that "raise[s] a right to relief above the speculative level." *See ATSI Commc'ns*, 493 F.3d at 98. The Court GRANTS Defendants' motion to dismiss Plaintiff's Fourth Amendment claim.

## III.  Plaintiff's State Law Claims

In addition to her federal claims, Plaintiff also brings several causes of action under state law, namely civil theft, conversion, and spoliation. The Court preliminarily notes that Plaintiff's civil theft claim is duplicative of her conversion claim. *See Smith Barney, Harris Upham & Co. Inc. v. Luckie*, 245 A.D.2d 17, 19 (1st Dep't 1997) (noting that the "New York analogue" for civil theft is conversion). Moreover, although Plaintiff asserts a spoliation claim, New York does not recognize spoliation of evidence as an actionable tort. *See Ortega v. City of New York*, 9 N.Y.3d 69, 83 (2007)

---

[11]    Plaintiff claims that this case presents an issue of first impression because "[n]o cited cases deal[] with a situation where a Candidate is [misled] into handing over Petitions[] and then not allowed, prior to any applicable deadline passing, to participate in the same process that other candidates used 2017 [a reference to the *Swiller* decision]." (Pl. Opp. 10.) However, as her complaint notes (Compl. ⁋ 33), and Defendants observe (Defs. Reply 8), Plaintiff's failure to appear on the ballot related to objections to her Petitions that prevented her from meeting the election's signature requirement. As such, even assuming misleading conduct, Plaintiff provides no basis for this Court to conclude that her exclusion from the primary ballot was a Fourth Amendment violation.

("[W]e join the majority of jurisdictions to consider the issue and decline to recognize spoliation of evidence as an independent tort claim." (internal citation omitted)); *see also Kamdem-Ouaffo v. Balchem Corp.*, No. 17-CV-2810 (KMK), 2018 WL 4386092, at *18 (S.D.N.Y. Sept. 14, 2018) ("New York State law does not recognize an independent cause of action for spoliation."); *Gardner v. Verizon Commc'ns*, No. 16-CV-814 (RRM) (RML), 2018 WL 1513636, at *1 (E.D.N.Y. Mar. 26, 2018) ("Spoliation is not a stand-alone cause of action in New York"). Accordingly, Plaintiff's only cognizable state cause of action is her conversion claim.

The Court notes two issues that must be addressed related to this conversion claim. *First*, the Court will assess the impact of Plaintiff's failure to file a notice of claim as it relates to her conversion claim against BOE and the Individual Defendants in their official capacity. *Second*, because Plaintiff's federal claims are dismissed, there is a question about whether this Court should retain jurisdiction over that conversion claim. 28 U.S.C. § 1367(c)(3).

### A. Plaintiff's Failure to File a Notice of Claim

Under New York law, a notice of claim is a condition precedent to bringing a tort lawsuit against a municipal corporation, or any of its officers, agents, or employees. N.Y. Gen. Mun. Law §§ 50-e(1), 50-i(1); *see Parise v. N.Y.C. Dep't of Sanitation*, 306 F. App'x 695, 697 (2d Cir. 2009); *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999). The "[n]otice of claim requirements are construed strictly by New York state courts, and failure to abide by their terms mandates dismissal of the action for lack of subject-matter jurisdiction." *Tulino v. City of New York*, No. 15-CV-7106 (JMF), 2016 WL 2967847, at *3 (S.D.N.Y. May 19, 2016) (internal quotation marks omitted); *see Hardy*, 164 F.3d at 793-94 ("Notice of claim requirements are construed strictly by New York state courts. Failure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action.").

Here, Plaintiff concedes that she has not filed a notice of claim, such that conversion claim is seemingly subject to dismissal under New York law. (Pl. Opp. 13.) Plaintiff nevertheless argues that she may seek leave to serve a late notice of claim under New York General Municipal Law § 50-e(5), such that dismissal is not warranted. (*Id.*) It is true that, under Section 50-e(5), "[u]pon application, [a] court, in its discretion, may extend the time to serve a notice of claim." N.Y. Gen. Mun. Law § 50-e(5). However, New York's General Municipal Law has only vested the power to grant notice of claim extensions to the New York State supreme courts and county courts. *Id.* § 50-e(7). Federal courts are not authorized to grant such extensions. *See, e.g.*, *Davis v. City of New York*, No. 12 Civ. 3297 (PGG), 2018 WL 10070540, at *13 (S.D.N.Y. Mar. 30, 2018) ("New York has given the power to extend deadlines for serving notice of claim to state supreme courts and county courts, and federal courts are not authorized to grant such extensions."); *Dayton v. City of Middletown*, 786 F. Supp. 2d 809, 824-25 (S.D.N.Y. 2011) ("[T]his Court lacks jurisdiction, pursuant to § 50–e(7), to deem Plaintiffs' 5/30/09 Amended Notice of Claim for their state law claims against Orange County timely filed, or to grant an extension of time to file a late notice of claim"). As Plaintiff has neither filed a notice of claim nor indicated that she has applied to any state or county court to file a late notice of claim, the Court GRANTS Defendants' motion to dismiss Plaintiff's conversion claim against BOE and the Individual Defendants in their official capacity. The claim is dismissed without prejudice upon a showing that Plaintiff has obtained leave to file a late notice.

### B. Supplemental Jurisdiction

Once a court dismisses a claim over which it had original jurisdiction, § 1367(c) provides for "an occasion to decline to exercise supplemental jurisdiction." *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 83 (2d Cir. 2018). "Under this prong, in a great many cases, the evaluation will usually result in the dismissal of the state-law claims." *Id.* (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Lievre v. JRM Constr. Mgmt., LLC*, No. 17-CV-4439 (BCM),

2019 WL 4572777, at *22 (S.D.N.Y. Sept. 20, 2019) ("In the 'usual case' in which 'all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."). Still, "the fact that a federal law claim has been eliminated prior to trial does not automatically render dismissal of state law claims appropriate." *See Colón v. N.Y.S. Dep't of Corrs. and Cmty. Supervision*, No. 15 Civ. 7432 (NSR), 2019 WL 5294935, at *11 (S.D.N.Y. Oct. 17, 2019). Instead, a court should assess whether exercising jurisdiction will promote "economy, convenience, fairness, and comity." *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004) (citation omitted); *Kolari v. N.Y. Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional values of judicial economy, convenience, fairness, and comity." (quoting *Cohill*, 484 U.S. at 350)).

Here, this case has yet to proceed beyond the pleading stage. Moreover, discovery has yet to be taken in any form. Courts have regularly exercised their discretion to decline supplemental jurisdiction in similar situations. *See, e.g.*, *Ruotolo v. Fannie Mae*, 933 F. Supp. 2d 512, 527 (S.D.N.Y. 2013) (declining to exercise supplemental jurisdiction where federal law claims were dismissed before trial upon defendants' motion to dismiss); *Dellutri v. Vill. of Elmsford*, 895 F. Supp. 2d 555, 575 (S.D.N.Y. 2012) ("[T]his case remains in its initial stages, and the Parties have not yet proceeded to discovery. As all of Plaintiff's federal claims have been dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims."); *Williams v. Berkshire Fin. Grp.*, Inc., 491 F. Supp. 2d 320, 329 (E.D.N.Y. 2007) (declining to supplemental jurisdiction where, inter alia, the "case ha[d] not progressed beyond the pleading stage[,] [n]o discovery has been taken[, and] [t]he parties ha[d] no investment in th[e] [c]ourt beyond the instant motions [to dismiss]."). On balance, the considerations of judicial economy, fairness, and comity militate in favor of this Court

declining to exercise supplemental jurisdiction at this time.  The Court GRANTS Defendants' motion to dismiss Plaintiff's conversion claim against the Individual Defendants, without prejudice.[12]

## IV.    Leave to Amend

It is within the Court's discretion to *sua sponte* grant leave to amend.  *See Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 106 (2d Cir. 1998); *Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 590 (S.D.N.Y. 2008).  To this end, under Federal Rule of Civil Procedure 15(a)(2), courts "should freely give leave" to amend a complaint "when justice so requires."  When exercising this discretion, courts will consider many factors, including undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility.  *Local 802, Associated Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Here, the Court will grant Plaintiff leave to file an amended complaint as to those claims not dismissed with prejudice.  Specifically, it is the Court's view that, notwithstanding the above explained deficiencies, Plaintiff could potentially plead facts that cure her complaint's defects.  To be sure, Plaintiff has high hurdles to overcome.  Nevertheless, the Court concludes that granting leave to amend in this case would not necessarily be futile at this juncture.  Furthermore, as this case is still in its infancy, there would be minimal prejudice to Defendants in permitting an amendment at this time.  The Court reminds Plaintiff that her amended complaint must comport with this Court's Opinion and Order.

---

[12]    Because the Court declines supplemental jurisdiction over the conversion claims, it will decline to adjudicate it on its merits.  *See Monzert v. United Secrutiy, Inc.*, CV 14-3274, 2016 WL 3538368, at *1 n.3 (E.D.N.Y. June 21, 2016) ("Since the Court declines to exercise supplemental jurisdiction, it declines to comment or rule on the merits of Defendant's argument that Plaintiffs have failed to state a breach of contract claim.").  The Court, however, notes that much of the same reasoning underlying the dismissal of Plaintiff's Fourth Amendment claim would be relevant to an analysis of Plaintiff's conversion claim.  *See Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 522, 534 (S.D.N.Y. 2013) ("To make out a claim for conversion, a plaintiff must show '(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights.'  'Where possession of property is initially lawful, conversion occurs when there is a refusal to return the property upon demand.'" (internal quotations and citations omitted)).

## CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED. Plaintiff, however, is granted leave to file an amended complaint as to any claims that have not been dismissed with prejudice. If she chooses to do so, Plaintiff will have until May 29, 2020 to file her amended complaint. Defendants are then directed to answer or otherwise respond by July 13, 2020. Failure to file an amended complaint within the time allowed, and without good cause to excuse such failure, will result in the dismissal of Plaintiff's federal claims with prejudice and dismissal of her state law claims without prejudice so that she may re-file in state court.

The Court respectfully directs the Clerk of the Court to terminate the motion at ECF No. 32.

Dated: April 7, 2020
White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge